## MEREDITH v. ARKANSAS LOUISIANA GAS CO.

### No. 5746.

Court of Appeal of Louisiana. Second Circuit.

Nov. 4, 1938.

Rehearing Denied Dec. 9, 1938.

Writ of Certiorari and Review Denied Jan. 10, 1939.

Foster, Hall, Barret & Smith, of Shreveport, for appellant.

Blanchard, Goldstein, Walker & O'Quin and Ben C. Dawkins, Jr., all of Shreveport, for appellee.

DREW, Judge.

This is a suit for personal injuries and property damage alleged to have been sustained by plaintiff due to the fault of the defendant's agent in a collision between plaintiff's automobile and a truck owned by the defendant at the intersection of Kings Highway and Barret streets in the city of Shreveport, at approximately 8:15 A. M., April 7, 1937. The lower court rejected the demands of plaintiff and he prosecutes this appeal.

Barret street runs north and south while Kings Highway runs east and west. Plaintiff was traveling north on Barret and defendant's truck was proceeding east on Kings Highway. Plaintiff was therefore entering the intersection from the right of defendant's truck driver and, as neither street is a favored one under the law, plaintiff had the right of way, under Act 21 of 1932, Title 2, § 3, Rule 11 (a), if both vehicles reached the intersection at approximately the same time.

The two vehicles were traveling at comparatively the same rate of speed

and neither was violating the speed limit fixed by law. After the accident, plaintiff's car was jammed against a telephone pole located at the northeast corner of the intersection, and the defendant's truck was turned on its side against the car. There were only two eyewitnesses to the accident, namely, the plaintiff and the driver of defendant's truck. The truck driver testified as follows:

"Q. Mr. Scales, you are one of the defendants in this case? A. Yes.

"Q. You were driving the truck at the time of the accident which is the subject of this suit? A. Yes, sir.

"Q. Who came into the intersection first, you or the car which was being driven by Mr. Meredith? A. I did.

"Mr. Hall: If the Court please, Mr. Scales is not a defendant in this suit.

"Q. You are not a defendant in this case? I was mistaken. A. That is right.

"Q. How far had you gotten into that intersection before the collision occurred? A. Just a little past the middle of the intersection.

"Q. When did you first see the car driven by Mr. Meredith? A. Just after I entered the intersection of the street.

"Q. Did he see you? A. Not that I know of.

"Q. Did you hit his car or did his car hit you? A. His car hit me.

"Q. What happened to your truck? A. I turned the front wheels to the left and his car hit into my front wheels.

"Q. What front wheels? A. Right at the right front wheel.

"Q. What happened to your truck? A. It turned over on its right side. * * *

"Q. How far was Mr. Meredith's car up the street when you saw it? A. Some twenty or thirty feet.

"Q. Did he make any attempt to stop his car in any manner? A. Not that I saw.

"Q. Would you have seen it? A. I think I would have.

"Q. Did he put on his brakes? A. I could not tell that he did.

"Q. He was driving a 1931 Chevrolet? A. I don't know what model it was. I noticed it was a Chevrolet, but I did not know what model it was.

"Q. How fast were you driving at the time of the accident? A. From 18 to 20 miles an hour.

"Q. I believe you have stated that you were going east on Kings Highway? A. Yes.

"Q. And he was going north? A. On Barret.

"Q. On Barret Place. What did you say was the point of contact between the truck and the car? A. His front wheel or fender or bumper hit the right front wheel of the truck.

"Q. How fast was he driving down the street, could you estimate it? A. I do not know, sir.

"Q. Did you see Mr. Meredith after the accident? A. Yes.

"Q. Did you look into his car? A. Yes.

"Q. Did you find anything in there? A. I looked in to see if he was pinned in in any way and I saw that he wasn't and I asked him if he was badly hurt. All he ever said was 'take me to 2760 Barret Place'.

"Q. Did you find anything in the car? A. I did not."

When called on cross-examination at the beginning of the trial, he testified as follows:

"Q. All right. Will you tell just how that accident happened? A. I was going east on Kings Highway and the other car was going north on Barret.

"Q. You are speaking of Mr. Meredith's car? A. Yes, sir.

"Q. He was going north on Barret. Was that toward the downtown part of Shreveport? A. Yes, sir.

"Q. All right, go ahead. A. I saw him coming up there pretty fast. I don't know just how fast he was coming up there but it didn't look like he was going to stop and I threw on my brakes and turned the wheels of my truck to the left to try to give him room to get by.

"Q. Now, wait a minute. In the answer to this case it is set up by the defendant as follows: (reading) 'Further answering, defendant shows that the truck, being driven by Joe Scales, entered the intersection of Barret street and Kings Highway and had crossed more than one-half the distance of the intersection, while driving on his right hand side of the street, when struck by the car being driven by plaintiff', that is Mr. Meredith, 'and if there was any negligence whatsoever on the part of Joe Scales, which is denied by defendant, defendant shows that plaintiff had the last clear

chance to avoid the accident.' In other words, it is set up here in the answer that you were driving on the right hand side of Kings Highway, the way you were going? A. Yes.

"Q. And that Mr. Meredith's car struck you, is that correct? A. Yes.

"Q. What part of your truck did he strike? A. Right at the front wheel.

"Q. Right at the front wheel, What part of his car struck the truck? A. It was either the front wheel or fender right at the front part of his car.

"Q. Right at the front part of his car? A. Yes.

"Q. His left front wheel? A. Yes, that would be his left front wheel.

"Q. His left front wheel or his left front fender hit your truck? A. Yes.

"Q. What part of your truck did it hit? A. Hit right at the front wheel.

"Q. Hit right at the front wheel. Hit right at your right front wheel? A. Yes, sir.

"Q. You are positive, as set forth in your answer, that his car hit your truck? A. Yes, sir.

"Q. That is all."

Plaintiff testified as to the accident as follows:

"Q. Describe to the court what happened when you reached the intersection of Barret and Kings Highway. A. When I reached the intersection, there wasn't any automobile in sight. I started into the intersection and did enter it and there was the truck coming. It got within at least 30 or 35 feet from me on Kings Highway. I blew my horn because I knew the driver didn't see me, he was looking back, and he hit me as I crossed Kings Highway on Barret.

"Q. Relative to the center of the intersection, where was your car when it was struck? A. When it was struck by the truck?

"Q. Yes. A. It was on the north end of Barret and Kings Highway.

"Q. Where did the truck strike your car? A. It struck me practically in the center.

"Q. In the center of what? A. In the center of my automobile; right in between the door.

"Q. You mean the center of the front, back or sides? A. Well, it was the center

of the automobile from the front to the back. Right in the front of the door.

"Q. You mean it struck you half-way between the front of the car and the back of the car? A. Yes, sir.

"Q. Did your automobile hit the truck with its front end? A. No, sir.

"Q. How fast were you going, Mr. Meredith? A. I was going practically 15 miles an hour."

On cross-examination, he testified as follows:

"Q. You say the truck hit you right square in the middle? A. Yes.

"Q. Where were you in the street when the truck hit you? A. On the north end of Barret.

"Q. And it hit you right square? A. Yes, right in the center.

"Q. Right in the center. With both front wheels? A. Yes.

"Q. It was driving directly at a right angle to the way you were going and just hit you right in the middle? A. Driving east on Kings Highway.

"Q. He hit you square and was driving at a right angle to you? A. He cut in; looked like he was trying to go up Barret.

"Q. Oh! He cut in! He didn't hit you square then. A. Yes, he hit me square."

Immediately after the accident, a Mr. Jennings happened at the scene and took six kodak pictures showing the position of the vehicles involved in the wreck. The photographs were offered in evidence. Other pictures were offered in evidence showing the intersection and also the front of plaintiff's car. The photograph of the front of plaintiff's car discloses beyond any doubt that there was no injury to it, the headlights, radiator, bumper, left fender, left front wheel and hub-cap were all intact, and all refute beyond dispute the testimony of defendant's truck driver that plaintiff's car ran into his truck.

The shop foreman of defendant company, who supervised and repaired the front of defendant's truck, testified that the radiator on the truck was mashed and ruined and a new one had to be put on; also that the front bumper was knocked off the truck. The condition of the truck, according to defendant's own witnesses, clearly discloses that the front end of it struck plaintiff's car. There was nothing else for it to strike, as plaintiff's car was between the truck and the telephone pole,

and it is not contended that the truck turned over other than on its side, which could not have caused the damage to the radiator.

We are of the opinion that these facts corroborate beyond doubt the testimony of plaintiff that he entered the intersection before defendant's truck entered it and that defendant's truck ran headon into the center side of his car after he was at least, if not more than, half way across the intersection. Plaintiff had the right of way by law for two reasons; (1) he reached the intersection before the truck did, and (2) he was approaching the intersection from the truck driver's right. Under these conditions, defendant's truck driver was duty bound under the law to have brought his truck to a stop if necessary to allow plaintiff to cross the intersection, and was guilty of negligence in entering it at the time he did. Defendant is therefore liable to plaintiff for any and all damages done him unless plaintiff was guilty of contributory negligence which was a proximate cause of the accident.

■ Article 27 of defendant's answer sets forth the plea of contributory negligence urged by it, and is as follows:

"Appearer further shows that plaintiff at the time of the accident was under the influence of intoxicating liquor or a bad hangover and did not have possession of all of his mental faculties, failed to keep a proper lookout so as to notice the truck of defendant, which had entered the intersection of the street prior to the time that plaintiff entered the intersection, and that plaintiff's car struck the truck belonging to defendant; that defendant denies that Joe Scales was negligent in any manner, but in the event that the court should hold that there was any negligence on the part of Joe Scales, then and in that event, Sam Meredith had the last clear chance to avoid the accident and was guilty of contributory negligence on account of the facts set forth in this paragraph of the answer."

The allegation of intoxication is not borne out by the testimony, if it was it did not have any bearing on the accident under the facts found by us. Intoxication alone is not sufficient to constitute negligence. 45 Corpus Juris, 997, § 551.

■ The other allegations, to-wit, that plaintiff entered the intersection after it had been pre-empted by defendant's truck and that plaintiff's car ran into defendant's truck are not borne out by the testimony, and we have found the facts to be just to the contrary.

■ The only other allegation is that plaintiff failed to keep a proper lookout.

Plaintiff testified that before reaching the intersection, he looked but did not see any car coming on Kings Highway and that as he drove into the intersection, he saw defendant's truck about 35 feet west of him; that the truck driver was not looking ahead, but down and to the side; that he blew his horn and as the truck came nearer to him, the driver attempted to cut to his left and hit plaintiff's car near the center of the left side. The truck driver testified he saw plaintiff's car before it reached the intersection and saw plaintiff was not looking and was not going to stop. At that time he put on the brakes and cut to the left and that plaintiff ran into his truck.

This testimony is in direct conflict, but it makes no difference for the law is that each of them shall see that which he could and should have seen. Therefore, in the eyes of the law, taking into consideration the conditions and the locus of the accident, plaintiff could have seen defendant's truck when it was 50 or more feet from the intersection, and defendant's truck driver could have seen plaintiff's car when it was a like distance from the intersection. They were both traveling at approximately the same speed; therefore both should have reached the intersection at comparatively the same time. Plaintiff had the right of way and defendant's truck did not. Plaintiff had the right in law to assume that the truck driver would observe the law and stop. Plaintiff entered the intersection. He did not violate any law in doing so. The truck driver immediately thereafter entered the intersection. He violated the law when he did. After plaintiff entered the intersection, he did nothing to cause or bring about an accident. Where then could he be guilty of any negligence? We are of the opinion he was not.

■ A different situation might be presented if the truck driver had been speeding east on Kings Highway and plaintiff could and should have seen that he could not pass the intersection without being run into. However, that is not the case here. The law of this state, as well as of other jurisdictions, is, we think, in conformity

with our finding here, and in the case of Sliter v. Clark et ux., 127 Wash. 406, 220 P. 785, the court, we think, summed up in concrete sentences the substance of the many decisions of this state when it said [page 786]:

"In so holding, we think the court mistook the applicable principles of law governing in such cases. As we have shown, it is the statutory duty of a driver of a motor vehicle when approaching a road intersection to look out for and give way to vehicles simultaneously approaching on his right. No such duty is imposed upon a driver as to vehicles approaching on his left. The driver of such a vehicle, if he is traveling within the speed limit and on the right-hand side of the highway, may proceed on his course without being guilty of a charge of negligence. This was the situation here. The appellant and the respondents were simultaneously approaching the road intersection. The appellant was on the right of the respondents; he was traveling on the right-hand side of the way, and was traveling within the statutory speed limit. He had the right to presume that the respondents would give heed to the statutory rules of the road, and not drive their car across the road immediately on his front. We cannot think, therefore, there was any reason to charge him with contributory negligence as matter of law."

Some of the many Louisiana cases on this point are as follows: Hamilton v. Lee, La.App., 144 So. 249; Arena v. Morris & Co., 14 La.App. 563, 130 So. 565; Lake v. Employers' Liability Assurance Corporation, La.App., 152 So. 600; Jimes v. Fidelity & Casualty Co. of New York, La.App., 163 So. 421; Adams v. Burnett, La.App., 150 So. 403; Martin v. Missouri Pacific Transp. Company, La.App., 172 So. 558; Raggio v. Natchitoches Motor Company, La.App., 174 So. 397; Cooke v. Seegers, La.App., 136 So. 216.

The last cited case is on all-fours with the one at bar.

■ We are convinced the plea of contributory negligence has not been proved and the facts of the case are entirely with plaintiff. The last clear chance doctrine urged has no application when applied to the facts as found by us.

Plaintiff sued for $11,665.50, itemizing his damages as follows:

| | |
|---|---:|
| Disfigurement and permanent injury to nerves, muscles and arteries about the head and face | $ 2,500.00 |
| Injury to body, limbs and fingers, including fracture of clavicle and broken ribs as above described, and traumatic pleurisy | 5,000.00 |
| Pain and suffering | 1,500.00 |
| Permanent injury to nervous system | 2,000.00 |
| Loss of earning capacity for 21 days | 157.50 |
| Total loss of value of car | 200.00 |
| Sanitarium bill | 58.00 |
| Doctor's bills incurred and to be incurred as result of said injuries | 250.00 |
| Total | $11,665.50 |

■ On trial of the case, plaintiff proved that he lost 21 days from work and that his average daily earnings were $7 per day, or a total of $147. His doctor's bill was $110; sanitarium bill $58; and his car, of the value of $200, was completely demolished. These items total $515, and he is entitled to recover that amount.

■ As the result of the accident, Mr. Meredith suffered severe injuries. He was confined to his bed at the Schumpert Sanitarium for 6 days and then remained at home in bed for an additional 13 days. He went to work after 3 weeks.

Dr. T. J. Fleming, who reached the sanitarium about 8:30 the morning of the accident and dressed the injuries of Mr. Meredith, continued to treat him during the time that he was confined in the sanitarium and at home. Dr. Fleming testified that when he found him he was badly bruised and cut up, "there was some shock and concussion of the brain; he was partially delirious". He further stated that he was "pretty well knocked out, and just partially conscious". He stated:

"Q. How long was it before he could talk sensibly, know what he was saying? A. 48 hours or more before he was really normal as to his memory. * * * He received two cuts on his forehead that extended down to the bone. One was about two inches long and one about two and one-half inches long. * * * These lacerations left scars that will always be noticeable."

504

A great many stitches had to be taken to sew up the cuts on his forehead.

"He had a comminuted fracture of the left clavicle. That is the left collar bone. He also had a fracture of the first rib and of the seventh and eighth ribs on the left side. These fractures were complete,—of the ribs. They evidently stuck into the pleurae to some extent because he had pleurisy."

Dr. Fleming also testified that the fracture of the collar bone, having been a comminuted fracture, had thrown out quite a bit of callous and that Mr. Meredith suffered pain when he raised his arm above the shoulder. He also stated that Mr. Meredith complained of his side hurting him where the ribs were broken, the seventh and eighth. Dr. Fleming stated, "evidently he has some adhesions there between the pleurae of the chest and the lung tissue". He further testified:

"Q. What would you say as to his suffering from the injuries received, immediately after the accident? Say for the next week or so? A. He suffered for quite a number of days severely. When you have a patient like that a cough or a long breath, or anything like that, will cause excruciating pain.

"Q. Did you give him any narcotics of any kind? A. He took quite a number of narcotics, sedatives.

"Q. Did you visit him after he went home? A. Yes.

"Q. Was he still suffering any out there? A. Well, he complained of suffering even after he went to work. Those are subjective symptoms.

"Q. I will ask you this as a medical expert. Although his complaint is subjective, would it be normal to expect a man to suffer, as a result of the injuries he received, during the period that he has complained of to you, and would that be what you would expect? A. Yes, he would suffer for quite a long period after an accident of that character."

The accident in this case happened on April 17, 1937. Seven months later, on November 17, 1937, Mr. Meredith was examined by Dr. B. C. Garrett and Dr. Norfleet. Their testimony in no way conflicts or contradicts that of Dr. Fleming, except that these doctors failed to find any pleurisy existing on the date of their examination. However, it is uncontradicted that Mr. Meredith had suffered with pleurisy for a good long time after the accident.

For pain and suffering and disfigurement, and other injuries, we are of the opinion that the sum of $2000 will do substantial justice between the parties.

It is therefore ordered, adjudged and decreed that the judgment of the lower court is reversed; and there is now judgment for plaintiff against defendant in the full sum of $2515, with legal interest thereon from judicial demand until paid; and for all costs of both courts.