**JOHNSON et ux. v. FABACHER et al.***
No. 16663.

Court of Appeal of Louisiana. Orleans.
June 14, 1937.

Henriques & Mayo, of New Orleans, for appellants.

Porteous, Johnson & Humphrey, of New Orleans, for appellees.

JANVIER, Judge.

Mrs. Neville Johnson sustained personal injuries in an automobile collision at the corner of Marengo and Freret Streets on October 1, 1935, at about 2:30 o'clock in the afternoon. The motor vehicles involved were a Ford "V–8" Tudor sedan, occupied by Mrs. Johnson and her husband and driven by her, and a Chevrolet truck owned by defendant Albert Fabacher, Jr., doing business as Hammond Dairy Company, and operated at the time by a colored chauffeur, Edward Gremillion, who admittedly was acting within the scope of his employment. The other defendant, New Amsterdam Casualty Company, is the liability insurance carrier of defendant Fabacher.

The Ford sedan was rather seriously damaged, as were various articles which were being transported in it, and Mr. Johnson seeks recovery for the amount expended in repairing the car, the amount of damage sustained by the personal effects, and for the costs of hospital and medical services rendered to Mrs. Johnson.

Mrs. Johnson's injuries consisted, in the main, of several fractures of the bones of her left hand, and for her personal injuries she prays for judgment in the sum of $6,000.

Plaintiffs allege that the Ford was being driven out Marengo street in the direction of Lake Pontchartrain and that, as it reached the corner of Freret street, it was brought to a full stop by Mrs. Johnson alongside a "stop" sign erected in compliance with the traffic ordinance of the city of New Orleans, No. 13702, C.C.S.; that at that point both Mr. and Mrs. Johnson looked down Freret street to see if any vehicle was approaching on that street; that as they looked they saw the Chevrolet

*Rehearing denied Oct. 4, 1937.

truck coming up Freret street about a block away and at a speed which did not appear to them sufficient to bring the Chevrolet to the crossing before their Ford could pass to the other side; that Mrs. Johnson then started the Ford across Freret street; that the crossing was made at a moderate speed—in their testimony they fix it at from 8 to 10 miles per hour—and that, as the Ford had practically completed the crossing, the Chevrolet truck, which had been approaching at an extraordinarily fast speed, crashed into the right rear of the Ford, hurled it completely across Marengo street, and turned it over on its side, partially on the grass plot, between the curb and the sidewalk; that the Ford had pre-empted the intersection; and that the proximate cause of the accident was the negligence of the driver of the Chevrolet truck in not according .to the Ford the right of way to which plaintiffs allege it was entitled by reason of its having entered the intersection first.

Defendants maintain that the truck approached the intersection at a moderate speed and that, just before it reached Marengo street, the Ford, without stopping, dashed across in front; that the rear of its right side "sideswiped" the front of the truck just as it was being brought to a stop; that the speed of the Ford was so great that it continued on for some distance, crossed to the upper side of Marengo street, and turned over 20 or 30 feet from the corner, after its front wheels had mounted the curb, which was 6 or 8 inches high.

· The jury rendered a verdict in favor of Mr. Johnson for $696.75 and in favor of Mrs. Johnson for $3,000. From a judgment based on this verdict, defendants have appealed. Plaintiffs have answered the appeal, conceding that the judgment in favor of Mr. Johnson is correct, maintaining, however, that it should be amended so as to award to Mrs. Johnson the amount originally prayed for.

The question presented is solely one of fact, and the two versions of the accident cannot be reconciled. In support of the testimony of plaintiffs there is practically no evidence, whereas the physical facts overwhelmingly corroborate the testimony of the driver of the truck and that of the witness whose version of the accident coincides with that of the driver.

In the first place, it is obvious that, as plaintiffs reached the corner and commenced to cross, the truck was not so far away as they say it was, because, had it been a block away when they stopped (if they did stop) and had it been three-quarters of a block away when the Ford commenced its progress across Freret street, it is obvious that there would have been no accident, because it is not claimed that the speed of the truck was greater than about 30 or 35 miles per hour, and it is conceded that the speed of the Ford was about 8 or 10 miles per hour, and it is impossible to believe that, had the facts been as stated by plaintiffs, the Ford would not have completely crossed Freret street and safely started on its way out Marengo street. The distance across Freret street is not more than 30 or 40 feet and, if plaintiffs' version of the accident is correct, the Ford was already moving and had only to traverse that distance while the truck, approaching at about 35 miles per hour, had more than 200 feet to go.

In Thibodeaux v. Star Checker Cab Co., 143 So. 101, 103, we said: "It is very difficult for us to accept his statement that he saw the taxicab about a block away and that it struck his car before he could complete the crossing, for the taxicab would have had to be going at a terrific rate of speed to have covered the distance in so short a period of time. Yet all the evidence shows that it came to rest a very short distance from the point of contact."

Mr. Johnson stated that when the truck hit the rear of the Ford the former stopped with "the front part * * * slightly in Marengo Street and most of it * * * still in Freret Street." If the truck stopped with the front portion in the position described by Mr. Johnson, it was only a very few feet from the point at which the impact took place, and it could not have been going at any great speed when the collision occurred. Yet Johnson testifies that the truck was proceeding at a speed of "between thirty and thirty-five when he struck us." Had that been the fact, obviously it could not have stopped immediately, as the witnesses agree that it did.

Another fact which cannot be reconciled with plaintiffs' theory is that the damage to the Ford car was largely sustained by its left side. If the truck had crashed into its right rear at the terrific speed claimed—so hard that it knocked it across the street and turned it over—surely severe damage would have resulted at the point of impact, and surely, also, had the truck dashed headlong into the Ford the damage to the truck

would have been sustained across its entire front—its right side as well as its left—and the headlights and the bumper would have been crushed backwards into the front of the radiator. But the evidence shows that the damage sustained by the truck was, in the main, on the left front side and that the bumper and the fender and the left headlight were not crushed backwards into the radiator, but slightly forward and to the right. The front bumper is shown to have been broken loose at the left end and to have been twisted to the right and slightly forward and the left fender and the headlight were also bent to the right. Mr. Muntz, the mechanic who repaired the truck, in describing the damage to the bumper, said: "The bumper, you see, runs across the truck and the ties on to the chassis, which is about ten inches from the chassis, was pulled out, and out, like a hinge would open, toward the front of the truck."

Even the front axle was bent, at its left end, slightly forward, all of which facts completely corroborate the statement of the driver of the truck to the effect that he had succeeded in bringing the truck to a stop just as the Ford, as it passed by at an excessive speed, "sideswiped" the front of the truck, pulling the bumper, the left fender, and the headlight to the right and slightly forward.

Clarence Butler, a colored pedestrian whose testimony is much criticized by counsel for plaintiffs, was on or approaching the corner. He describes the accident as follows: " * * * I see the car when it was crossing Howard, coming full speed, looking like to me 35 or 40 miles an hour, the way it was running, the speed it was coming, and when she got to Freret and Marengo she didn't stop, just crossed right on over ahead of the truck. The truck was coming along about 20 or 25 miles an hour, slow gait, coming up, and this truck got in the center of the street, near the center of the street, and this lady was coming across full speed, hadn't stopped yet or slowed down either—that time the car struck that truck on the front wheel and bent the left hand fender on the truck and knocked the left side of the bumper off and the other side of the bumper didn't fall."

He gives another picturesque description of the accident as follows: "The truck was in the intersection first, the truck beat the automobile there by just the least bit first. I stood up and looked at it good, myself, when it happened, and at the time the truck seemed to me when he put his brakes on the automobile run up and hit a glancing lick and took around the front of it, and at that time she rolled about 30 feet and turned over on an angle."

Counsel severely criticize this witness, charging that, in less than one minute during his examination on the witness stand, he contradicted himself by first stating that "the right rear wheel of this Ford car was all busted up" and then later saying that the damage was "toward the front fender." The record shows that during that examination in which the right rear wheel was referred to as having been "busted up" the words were used by counsel for plaintiffs and not by the witness himself; in other words, counsel for plaintiffs said: "The right rear wheel * * * was all busted up?" And the witness answered: "Yes, sir," and a few questions later the witness, realizing that counsel had led him to say something that he did not mean to say, corrected counsel and stated that the damage was towards the front. The witness was a negro laborer of limited intelligence and he at first did not realize that counsel was "putting into his mouth" words that he did not intend to use.

Counsel also point to what it is contended is a conflict between the testimony of the witness Butler and the testimony of the witness Gremillion as to the location of Butler when the accident occurred. Butler stated that he was standing on the uptown river corner of Freret and Marengo streets, waiting for the Ford to cross, whereas Gremillion testified that Butler was a short distance up Freret street, walking down towards the corner. Obviously this slight discrepancy would not be important were it not for the fact that counsel contend that, if Butler was not on the corner, but was a short distance up the street, he could not have seen the Ford when it crossed Howard street—a block away—because of the alleged fact that that corner was what is known as a "blind" corner; in other words, that there was a house located right on the property line which prevented Butler from seeing in Marengo street towards the river until he had actually passed the property line.

But the photograph shows that this is not exactly correct. The house on that corner is set from 8 to 10· feet back from both property lines and Butler, walking towards the corner, could have seen out towards Howard street when he was yet

some 15 or 20 feet from the corner. It is true that here, again, counsel for plaintiff "puts into the mouth" of Gremillion, the driver of the truck, words which, obviously, were not those of the witness, for counsel asks him if Butler was not far enough up the street to be behind one of the houses and Gremillion answers "yes." We do not think that this conflict is of any importance, since the evidence shows to our complete satisfaction that Butler witnessed the entire accident.

The expert witness, Morel, placed on the stand on behalf of defendants, is also attacked by counsel for plaintiffs, who state that he came to court to testify on behalf of defendants without ever having examined the truck until he did·so on the day of the trial. An examination of this witness' testimony shows very plainly that· he was brought to court to testify as an expert and to answer hypothetical questions. After having given his opinion, the witness was asked on cross-examination when he had examined the truck, and he stated that he had examined it only on the day of the trial, though he had stated to counsel for plaintiffs a week or so prior to the trial that he was going to appear as a witness against him. Obviously, what he meant was that he had been summoned by defendants as a witness and, therefore, he concluded that he was a witness "for the other side." At any rate, his evidence is of no great importance.

We have no doubt at all that the accident was largely the result of the fact that the Ford occupied by plaintiffs was so filled with household articles—including a large cabinet which was being carried on the right running board—that plaintiffs could not see nearly so well to their right as they should have been able to see. They make little of the cabinet and contend that it was so placed that they could well see in front of it and that it did not, to any extent, obstruct their view. Yet it is testified to by Johnson that it was about 5 feet high and that it was between 18 and 24 inches square, and that he was sitting on the right front seat with his arms out of the window, holding the cabinet. He states that most of it was to the rear of the middle post of the body of the car and that only a small portion of it was to the front, but the dimensions which he gives are such that it is obvious that a large part of it must have extended in front of the window and that his own body, turned sideways with his left arm extending out the right front window, must, to a considerable extent, have interfered with the vision of Mrs. Johnson.

Counsel for plaintiffs devote much attention to the traffic ordinance of the city of New Orleans, No. 13,702, C.C.S., and argue that the Ford entered the intersection first and that, as a result, as soon as it did so, the Chevrolet should have stopped and yielded to it the right of way. They point to paragraph (a) of section 15 of article V, which provides that "the operator of a vehicle approaching an intersection shall yield the right of way to a vehicle which has entered the intersection." But here, if the Ford entered the intersection first—and there is some doubt as to this—it did so only because its operator failed to stop before entering, as she should have done, and dashed into the intersection and across the path of the other vehicle, which was already so near that it could not be stopped before entering. Under such circumstances, the ordinance affords no protection.

We quite agree with what was said by our brothers of the Second Circuit in Driefus v. Levy et al., 140 So. 259, 263, as follows: "The mere fact that the truck driver entered the intersection first did not justify him in proceeding without caution and care, totally disregarding the on-coming car which he had seen, and he could have easily discovered by looking that whatever rights he had by virtue of entering the intersection first were not going to be respected by the Levy car. He should not have advanced into the pathway of the Levy car, and, by doing so, was guilty of negligence.

Where two vehicles on intersecting streets are approaching an intersection, whichever driver may have the technical right of way, it is the duty of each to observe the actions of the other car and to notice its speed, and, where the driver of one fails to do so and dashes out into the intersection in the face of the oncoming vehicle, the fact that, because of his speed, he entered the intersection first, does not entitle him to special consideration. The thought which we have in mind is well expressed in the Driefus Case, supra, as follows:

"It was the duty of the driver of the Yarbrough truck to determine, as a man of ordinary prudence would, whether, under all the circumstances, he had sufficient time to cross the intersection safely before

the arrival of the Levy car, which he saw advancing to cross his line of travel. He should have taken into consideration the width of the street, the relative speed of his truck and the Levy car, and the distance the Levy car was from the intersection when he started to cross. Any reasonably prudent man should have known that the crossing could not be made without a collision."

Of course, Mrs. Johnson claims that she did not dash out into the intersection but that she stopped and carefully looked to make certain that there was ample time and space for her to cross, but the physical facts make it certain that in this she and Mr. Johnson are mistaken.

Counsel for plaintiffs cite several cases, in each of which recovery was allowed and which cases, they contend, establish the doctrine that, where the operator of a vehicle desires to cross a favored thoroughfare, he need not wait until there is no traffic in sight on the favored street, but may proceed whenever there is an opportunity to do so provided by the fact that there is no vehicle sufficiently near to permit of its reaching the intersection in time to interfere with the crossing, taking into consideration the assumption that it is being operated at a lawful speed. They cite Vance v. Poree, 5 La.App. 109, Simpson v. Pardue, 15 La.App. 341, 131 So. 854, Fisher v. Levin, 16 La.App. 367, 134 So. 439, Bethancourt v. Bayhi (La.App.) 141 So. 111, Richard v. Canning (La.App.) 158 So. 598, and many other cases, and from these cases they contend that there has been established the rule that a vehicle whose driver intends to cross a favored thoroughfare may do so if there is no vehicle on the favored thoroughfare nearer than a half block.

Of course, neither this court, nor any other, so far as we know, has attempted to establish any arbitrary rule of distance in cases such as this; each must be determined on its own facts. If, as a matter of fact, the truck in this case had been as much as a half block away, and had been approaching at a speed of 20 or 25 miles per hour, which is testified to, and plaintiffs, at the speed of 8 or 10 miles per hour, had attempted to cross, there would have been no accident. If, on the other hand, the truck was nearer, or was coming at the terrific speed which plaintiffs attribute to it, then there was no excuse for their driving directly in front of it.

The fact that the truck skidded some 8 or 9 feet before it was brought to a stop does not, in our opinion, indicate any great speed on its part. But, if it had been proceeding at an extraordinary speed and had skidded into the intersection with its front end past the curb line only a few feet, then it must have been brought to a remarkably good stop, which would indicate that it was dangerously close to the intersection when Mrs. Johnson attempted to drive across in front of it.

The facts of this case bear considerable resemblance to those which were presented in the matter of Mr. and Mrs. Watkins Gough v. New Orleans Public Service, Inc., 174 So. 649, this court, decided May 31, 1937, which case grew out of an accident which, strangely enough, occurred at the same corner. There it was claimed by plaintiffs that the automobile in which Mrs. Gough was riding had been brought to a full stop on Marengo street before an attempt was made to cross Freret street, and that at that time the street car, which was involved in the collision, was "about 300 feet up Freret Street." We held that, had those been the facts, no accident would have occurred. We say the same in the case at bar.

We realize that the rule is well established that, where only questions of fact are involved, we should hesitate to reverse the findings made in the court a quo and that judgments based on jury verdicts should not be reversed unless they are manifestly erroneous. Our answer, however, is that the evidence convinces us that the finding below was obviously and manifestly erroneous and that the accident resulted solely from the negligence of plaintiffs themselves.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be and it is annulled, avoided, and reversed, and that the suit of plaintiffs be and it is dismissed at their cost.

Reversed.